IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs May 10, 2016

**STATE OF TENNESSEE v. ROBREKA JAY QUAN SULLIVAN**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2013-A-891    Steve R. Dozier, Judge**

---

**No. M2015-01407-CCA-R3-CD – Filed February 8, 2017**

---

The Appellant, Robreka Jay Quan Sullivan, was found guilty by a Davidson County Criminal Court Jury of aggravated robbery and aggravated burglary, and she received a total effective sentence of ten years. On appeal, the Appellant challenges the sufficiency of the evidence sustaining her convictions. Specifically, she contends that the victim's testimony was not credible and that the State proved, at most, that she was involved in the disposition of stolen property. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

William E. Griffith (on appeal) and Bryan Boyd (at trial), Nashville, Tennessee, for the Appellant, Robreka Jay Quan Sullivan.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Glenn R. Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

## I.  Factual Background

In March 2013, the Davidson County Grand Jury indicted the Appellant and Ladon Doak for the aggravated robbery of Ishabeka Williams,[1] the aggravated burglary

---

[1] The indictment lists Williams's first name as Ishaveka. Williams testified at trial, however, that her first name is spelled "Ishabeka."

of Williams's home, and the aggravated assaults of Shanelle Jones and Charmaine Peters. The defendants were tried jointly.

At trial, Williams testified that at the time of the offenses, January 18, 2013, she was living at 1609 11th Avenue North in Nashville. Apartments A and B were in the front of the building, and apartments C and D were in the back of the building. Williams lived in apartment B. She said that the apartment had a "shotgun layout." She explained that the front door opened into the living room, a bedroom was located to the left, another bedroom was located down a hallway and to the left, and the kitchen and the bathroom were in the back of the apartment.

Williams's aunt lived in apartment D. Sequoia, whose last name Williams did not know, and Charmaine Peters lived in apartment A. Williams became friends with the women because they were neighbors and talked each day. Williams also became friends with Shannelle Jones, who was Peters's friend and was often at Peters's apartment.

Williams recalled that on the night of January 17, 2013, Jones and Ladon Doak came to Williams's apartment. Jones introduced Doak, whom Williams had not met before, as her brother. The trio sat in the living room and talked. Doak asked if Williams would give him a ride so he could "rob his girl friend baby daddy." Williams responded that she was not interested. They changed the subject and continued talking. Doak and Jones stayed at the apartment for approximately two hours then left.

Later that night, Doak and Jones returned to the apartment. Doak asked Williams to drive him to "Dodge City." Williams, uncomfortable because of their earlier conversation about a robbery, asked her aunt to come with them. Williams drove Doak and Jones to "an alley-type road" in "Dodge City." After they got out of the car, Williams and her aunt returned home. Williams did not see Doak and Jones again until the next day.

The next afternoon, Jones called Williams and asked if she was at home. Williams responded that she was at her aunt's apartment. Approximately thirty minutes later, Williams returned home, and Jones walked into Williams's apartment. They sat in the kitchen, and Jones said that after Williams "dropped them off" the previous night, she and Doak "had words." Jones explained to Williams that "whatever they tried to do over there where [you] took them didn't go right."

Williams said that as they were talking, Doak and the Appellant, whom she identified in court, knocked on the front door of Williams's apartment. The Appellant, who "did all the talking," asked for Jones. Williams saw the Appellant's hand on a gun and knew "whatever they was there for wasn't any good." Accordingly, she told them that Jones was not there and must have gone to the store.

The Appellant and Doak left and walked down the street. A few minutes later, Williams asked Jones to get some dressing for her pizza from her aunt's apartment, and Jones left. When Jones returned, she did not lock the front door and did not act as if anything were wrong. Williams noticed that light was coming from the front of the apartment and realized that the front door was open. She saw the Appellant running down the hallway, carrying a chrome gun with a wooden handle. Doak was following the Appellant. Williams thought the Appellant and Doak were coming for Jones. Williams planned to move the piece of wood that was blocking her back door and go for help. Before she could leave, however, the Appellant struck her with the gun. Williams's forehead was bleeding, and she grabbed a towel from the stove. The Appellant demanded to know the location of "the money," "the guns," and "the dope." Williams responded that she did not have any of those items in her apartment. The Appellant told Doak to search the apartment and instructed Williams to sit on her bed.

Williams said that during the robbery, the Appellant and Doak "passed" the gun between them "twice." Doak never hit Williams, but before he began searching the apartment, he pointed the gun at her to get her to tell him where to find the money, guns, and drugs. Williams watched Doak search the apartment, beginning in Williams's bedroom. As he searched, he "trashed" the apartment, pulling all of the pillows off the couch and taking everything out of the closet and dresser drawers. When he did not find money, guns, or drugs, he took two cellular telephones, two televisions, two laptop computers, and Williams's purse, which contained her wallet and approximately $200. Williams recalled that while she was sitting on her bed, she noticed that Peters and Jones had entered the apartment. As the robbery proceeded, Peters and Jones "[p]aced" through the apartment.

During the robbery, the Appellant hit Williams with the gun five or six times, including twice on her head. The Appellant pointed the gun at Williams and remarked that she should kill Williams because she would call the police when the Appellant and Doak left. Williams promised she would not call the police.

Williams testified that the Appellant took the keys to her two-door Ford Explorer, and Doak told Peters and Jones to load the stolen items in the vehicle. After the vehicle was loaded, the Appellant and Doak got into the vehicle. As they were driving away, Williams called the police, reported the robbery, and described the perpetrators. She also told the police where she had taken Doak and Jones the day before, thinking they would return to that location.

Williams said that the police came to her apartment and took her statement. After about thirty minutes, the police took her to "the North precinct." When they arrived, Williams saw the Appellant and Doak in separate police cars. The police told them to

step out of the cars and asked if Williams could identify them. Williams identified them as the individuals who had robbed her. All of the stolen items were returned to Williams except the cash.

Williams said that she was not armed during the robbery and that Peters and Jones were also unarmed. Williams denied attacking or hitting the Appellant or Doak, explaining that she was afraid for her life. Williams said that the Appellant did not touch any of her belongings during the robbery and that Doak touched "everything."

On cross-examination, Williams denied that she went to Home Depot with Doak on January 17 to return some stolen items. She also denied going to the emergency room with her roommate, Michael Bloome, on January 17.

Williams acknowledged that she may have testified at the preliminary hearing that the only items taken were a couple of flat screen televisions and an old cellular telephone. She explained that at the time of the preliminary hearing, she was "still kind of devastated and shocked" and may have forgotten to mention all of the items that were stolen. She also explained that at the time she filed the police report, she did not know all of the items that had been stolen.

Williams said that she did not have a gun in her apartment and did not take a gun to another apartment. She explained that if she had a gun in the apartment, Doak would have discovered it during his search. She did not know why anyone would say she took a gun from her apartment and carried it to another apartment.

Williams acknowledged that she had been convicted of theft but asserted that she had stolen items from stores, not people. Williams further acknowledged that she had smoked marijuana on the afternoon of January 18 but said that she did not smoke marijuana with Doak the night before the robbery. Williams said that she had spoken with Jones and Peters since the robbery. She spoke with Peters and Peters's mother in a "three-way" telephone conversation. Peters's mother tried to convince Williams that Peters had nothing to do with the robbery, but Williams was convinced that Peters was not a "victim[] or witness[]." Peters's mother also said that the Appellant and Doak waited in apartment A for "the right time" to enter Williams's apartment. Williams said that she yelled when she first saw the Appellant but stopped when the Appellant struck her. She noted, however, that no one could have heard her.

On redirect examination, Williams explained that she did not agree to help Doak rob someone because "I don't do robberies. I don't rob people. Anything can happen in the midst of it. Like anything could have happened to me that day."

Metro Police Officer Steven Weir testified that on the afternoon of January 18, 2013, he and Officer Draves were in a police vehicle when they heard a radio report of a robbery at Williams's apartment. Thereafter, they heard Officer Vaughn, who was at the scene of the robbery, describe the suspects as a female wearing a yellow jacket and a male wearing all black clothing. Officer Vaughn reported that the suspects were around the "Cumberland View projects near North station," and Officers Weir and Draves went to that location.

As Officer Weir drove down 24th Avenue North towards McKinney, which was near Cumberland View, he saw the Appellant and Doak walking away from McKinney towards Clarksville Pike. The officers parked then approached the suspects. While Officer Draves approached Doak, Officer Weir walked up to the Appellant and asked "if she had anything on her." The Appellant responded by retrieving Williams's wallet from one of her sleeves and handing it to Officer Weir. Officer Weir opened the wallet and saw Williams's Tennessee identification card. He also found Williams's cellular telephone on the Appellant. The Appellant told Officer Weir that she had a gun in her waistband. While he placed her in handcuffs, another officer who had arrived on the scene retrieved the gun from her waistband. A magazine was in the gun. The officer removed the magazine from the gun, ensured a round was not in the chamber, and handed the gun to Officer Weir. Officer Weir opined that the gun was functional. Officer Weir saw "lots of blood" on the sleeve of the Appellant's jacket. He arrested the Appellant and transported her to the North precinct.

Metro Police Officer Edward Draves testified that on January 18, 2013, he was driving the police vehicle, and Officer Weir was in the front passenger seat. At 3:26 p.m., they received a dispatch about a home invasion at 1609 11th Avenue North. A BOLO (be on the lookout) accompanied the dispatch, stating that the suspects might be in the "Dodge City" area. Less than five minutes after receiving the BOLO, Officers Draves and Weir passed the Appellant and Doak walking down the sidewalk in the "Dodge City" area. The officers realized that the Appellant and Doak matched the description given in the BOLO.

Officer Weir "yelled out" to the Appellant and Doak. The Appellant immediately stopped, but Doak continued walking away. Officer Draves got out of the vehicle, followed Doak, and made Doak stop. Officer Draves asked Doak's permission to perform a pat-down, and Doak consented. During the search, Officer Weir found Williams's car keys in Doak's coat pocket and her television remote in his pants pocket.

Officer Draves said that he and Officer Weir transported the Appellant to the North precinct. The officers wanted to keep the suspects separate, so another officer transported Doak to the North precinct. Officer Draves said that he saw the nine millimeter pistol that Officer Weir found on the Appellant.

- 5 -

On cross-examination, Officer Draves stated that the Appellant and Doak were found approximately one or two miles from Williams's apartment. He noted that the magazine in the gun found on the Appellant was loaded with 9 millimeter bullets. Officer Draves performed a search and learned that the gun had been stolen, possibly in California.

Metro Police Officer Gary Shannon testified that on the afternoon of January 18, 2013, he received a report of a home invasion at 1609 11th Avenue North. He was told that the suspects were driving a two-door, gold Ford Explorer and that they possibly were heading towards the "Dodge City" area. Officer Shannon drove toward "Dodge City," and when he got to 24th Avenue near Hyde, he saw that Officers Draves and Weir had taken two suspects into custody. Officer Shannon continued looking for the Explorer and found it between 23rd Avenue North and 24th Avenue North. Inside the vehicle, he saw televisions and laptop computers. Officer Shannon stayed with the Explorer until Officer Nate Ward arrived and began processing the vehicle. The vehicle was not moved until it was released to Williams.

Sergeant George Nathaniel Ward testified that on January 18, 2013, he was working with the crime scene unit, and he was dispatched to 2325 23rd Avenue North to process Williams's vehicle and the televisions and laptop computers inside the vehicle. He found fingerprints on the vehicle and both televisions.

Sharon Tilley, a crime scene technician with the Metro Police Department, testified that she was dispatched to Williams's apartment and that she arrived around 5:10 p.m. The inside of the apartment had been "ransacked." She took photographs of the apartment and began processing it. The only usable fingerprints she found were on a green storage box, a black plastic garbage can, and a Sony DVD box. Tilley recalled that pizza and ranch dressing were on the kitchen table. Tilley took photographs of Williams, who had a cut that appeared "fresh" over her right eye.

Linda Wilson, a latent print identification analyst in the Metro Police Department crime laboratory, testified as an expert in fingerprint identification. Wilson examined the fingerprints recovered by Tilley and Sergeant Ward. She was unable to make identifications based upon the fingerprints recovered by Tilley. She identified nine fingerprints from those recovered by Officer Ward. The fingerprints belonged to Williams, Patricia Owens, and Doak. Williams's fingerprints were recovered from the two televisions as well as the exterior of the driver's door and the rearview mirror of the Explorer. Owens's palm print was recovered from the rear windshield. Doak's fingerprints were recovered from the Sony television.

The State rested its case-in-chief. Doak and the Appellant chose not to testify. Shanelle Jones testified on Doak's behalf that after the Appellant and Doak left the apartment, Williams called the police. While speaking with the police, Williams went to the closet, removed a gun, and took the gun "behind the house." Jones said that she left the apartment and went to the bus stop; therefore, she did not know if Williams brought the gun back into the apartment. Jones acknowledged telling the police that Williams took the gun to her aunt's apartment. Jones conceded that she put one television inside Williams's vehicle during the robbery. She said that Williams did not have a job and that she told the police that Williams was "a booster."

On cross-examination by the Appellant's counsel, Jones explained that a booster was "[s]omeone who steals from stores and sells whatever they steal." Jones acknowledged that she had a prior conviction of aggravated burglary. Jones said that she knew the defendants but that she had never smoked marijuana with them.

Jones said that she left Williams's apartment and went to the bus stop because she was afraid that Williams had a gun. Jones did not call the police because Williams had already reported the crimes. Jones denied being "involved in this situation."

On cross-examination by the State, Jones acknowledged that she was on probation for the aggravated burglary conviction at the time the instant offenses were committed and that her probation could have been revoked by her "associat[ion] with a situation where there was a gun."

Jones again maintained that she was not involved in the crimes. She acknowledged that the night before the robbery, she and Doak "were back and forth" between Williams's apartment and Peters's apartment. Jones acknowledged that Williams drove Jones and Doak to a house in "Dodge City." Jones denied that she and Doak discussed a robbery while in Williams's apartment; she acknowledged, however, that while at the house in "Dodge City," Doak and "another guy" discussed a robbery. They asked Jones to participate in the robbery, and she declined.

Jones said that the next day, she again went "back and forth" between Williams's apartment and Peters's apartment. At one point, Peters went with Jones to Williams's apartment. While they were there, the Appellant and Doak came through the front door and walked into the kitchen. They each had a gun. Williams went to the back door and struggled to move the piece of wood that was blocking the door, but the Appellant "caught up" with Williams. Jones did not see what the Appellant did to Williams, but she saw that Williams was bleeding.

The Appellant and Doak told Peters and Jones to get down on the floor, and they complied. The Appellant and Doak asked Williams "about a gun, about money, and

other things." Williams said that she had already given them her wallet. Doak told Jones to take a television outside, and because he was pointing a gun at her, she complied. One of the perpetrators told Peters to take something outside. Jones said that during the robbery, the Appellant was "threatening us with her gun, telling us not to move." The Appellant and Doak put the stolen items in Williams's vehicle. Jones said that neither Williams, Peters, nor she brandished a weapon during the robbery. Jones maintained that she did not "enter into a common plan to sell" Williams's stolen property.

Charmaine Peters testified that she was nineteen years old. She was from Los Angeles, California, and some of her family still lived there. Her last visit to Los Angeles was one and one-half years before trial. Peters said that on the night of the offense, she saw only one gun; the gun was chrome-colored.

At the conclusion of the proof, the jury convicted the Appellant of the aggravated robbery of Williams, a Class B felony, and aggravated burglary, a Class C felony.[2] The jury acquitted her of the aggravated assaults of Jones and Peters.

The trial court sentenced the Appellant as a standard, Range I offender to concurrent sentences of ten years for the aggravated robbery conviction and four years for the aggravated burglary conviction.

On appeal, the Appellant challenges the sufficiency of the evidence sustaining her convictions.

## II. Analysis

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

---

[2] See also State v. Ladon Antoine Doak, No. M2015-01454-CCA-R3-CD, 2016 WL 4473118 (Tenn. Crim. App. at Nashville, Aug. 22, 2016), perm. to appeal denied, (Tenn. Nov. 17, 2016).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

As charged in this case, aggravated robbery is a robbery accomplished with a deadly weapon. Tenn. Code Ann. § 39-13-402(a)(1). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. Tenn. Code Ann. § 39-14-103(a). Aggravated burglary occurs when a person, without the effective consent of the property owner, enters a habitation with the intent to commit a felony, theft, or assault or enters a building and commits or attempts to commit a theft. Tenn. Code Ann. §§ 39-14-403(a); 39-14-402(a)(1). Moreover, the record reflects that the trial court instructed the jury on criminal responsibility. "A person is criminally responsible as a party to an offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Criminal responsibility for the actions of another arises when the defendant, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, . . . solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402(2); see State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999).

On appeal, the Appellant contends that the State failed to prove beyond a reasonable doubt that she took Williams's property or that she used a handgun. The Appellant asserts that the proof adduced at trial revealed that Williams had a history of theft convictions and was not credible. The Appellant also contends that, at most, the State proved that she "was involved in a plan to dispose of or sell property that was most likely stolen." The State responds that the evidence was sufficient to sustain the Appellant's convictions. We agree with the State.

The evidence in the light most favorable to the State was that the Appellant and Doak entered Williams's apartment without her consent. The Appellant hit Williams on the head with a gun and demanded drugs, guns, and money. Doak, with whom the Appellant was working in concert, searched the apartment and took televisions, laptop computers, cellular telephones, and Williams's purse, which contained her wallet and money. The Appellant took Williams's car keys, and Doak told Peters and Jones to load

the stolen items into Williams's Explorer. Jones, the defense's own witness, testified that both the Appellant and Doak had guns during the robbery. The Appellant and Doak drove away from the scene in the Explorer, and they were found one to two miles from Williams's apartment. The Appellant had Williams's wallet in her sleeve and a handgun in her waistband. Officer Weir noticed that the Appellant had a lot of blood on the sleeve of her jacket. Williams positively identified the Appellant and Doak as the robbers. The jury clearly resolved the issue of the credibility of the witnesses in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000).

From the evidence presented at trial, we conclude that a reasonable jury could have found the Appellant guilty of the crime as the principal offender or under a theory of criminal responsibility. Therefore, the evidence is sufficient to support the Appellant's convictions of aggravated robbery and aggravated burglary.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA MCGEE OGLE, JUDGE